PER CURIAM.
Eddie W. Wilson (“the husband”) and Suzanne L. Wilson (“the wife”) were married in 1977. In April 2007, the parties separated. The husband filed for a divorce in July 2007. After a trial in October 2010, at which the only issues for the trial court’s determination were whether 158 shares of stock held in the wife’s name could be considered marital property and, if so, the value of that stock, the trial court entered a judgment awarding the wife the 158 shares of stock and awarding the husband $120,000 in alimony in gross, to be paid over 10 years. After his post-judgment motion was denied, the husband appealed the judgment, arguing that the trial court had improperly admitted certain testimony, had improperly restricted cross-examination, had improperly relied on certain valuation testimony, and that, based on the evidence at trial, the award of $120,000 in alimony in gross was inequitable.
The record reflects the following facts. At the time the parties married, the husband was employed at Landry’s Boat Works. However, he had worked for a short time in 1976 at Sea Pearl Seafood Company, Inc. (“SPS”), a company owned, at that time, by the wife’s parents. The husband was dismissed from his employment with SPS in 1976 after he was accused of stealing money and shrimp from SPS. Apparently at the wife’s request, her father, Joseph Ladnier, hired the husband to work at SPS again in 1985. Since that time, the husband has worked at SPS; he has run the I.Q.F. plant, which individually quick freezes shrimp, since approximately 1995. He earns over $100,000 per year and has consistently received bonuses from SPS. As part of his compensation, the husband is provided a company vehicle; until June 2010, SPS also paid for his fuel. The husband further testified that until the summer of 2010 he had charged his lunch at a certain restaurant to SPS. The wife also works for SPS; she earns approximately $74,000 per year. The testimony at trial reflected that, once the divorce case was over, the husband would lose his job at SPS.
The parties’ separation was prompted, according to the husband, by his wife’s *125 controlling nature and his belief that the wife placed her family first in priority. The husband testified that the wife had handled the family finances and that she had placed him on a allowance of $40 per month. The husband had apparently admitted having committed adultery; however, based on the few references to the infidelity at trial, it is unclear whether the admitted infidelity was an affair in which he had been involved in 19.90 or a more recent relationship with a friend of the family into whose home he had moved after the separation of the parties.
In 1990, Joseph Ladnier transferred 137 shares of SPS stock to the wife. She executed a promissory note for $137,000, payable in annual installments of $21,347.35 over 10 years in favor of Joseph Ladnier. At trial, both the wife and Joseph Ladnier testified, however, that the stock was a gift to the wife and that the wife had never paid any money for the stock. Bruce Vest, SPS’s accountant, testified that the wife had not paid Joseph Ladnier for the 137 shares of stock, despite the fact that Joseph Ladnier had listed the annual payments as income on his annual tax returns.
In 2000, Joseph Ladnier and his wife sold their shares of stock to SPS for the price of $4,000 per share. That same year, SPS transferred 21 additional shares of stock to the wife. Although the husband testified that the wife paid for that stock with a check drawn from their joint checking account, the wife testified at trial that she had not paid for the 21 shares of stock. Vest testified that the wife had paid for the 21 shares with a check but, as he recalled, the check had been returned to the wife.
Vest also testified about SPS’s viability as a “going concern.” Vest stated that he had had concerns as to whether SPS was a going concern when he prepared the most recent tax return for the company. However, he testified, as of the date of trial, SPS was a “going concern” because, he said, he had determined that SPS had adequate equity to carry it through the next tax year.
The evidence established that the wife had received several disbursements from SPS after it became an “S” corporation in 2006. In December 2006, the wife received a $100,000 disbursement, which, she testified, she had placed in the parties’ joint checking account and which she used to pay off a home-equity debt and a debt owed to the parties’ home builder; the wife testified that the remaining funds, approximately $20,000, were used to pay regular family expenses. In April 2007, the wife received a $325,000 disbursement. She testified that the entire $325,000 was used to pay both state and federal income taxes. In December 2007, the wife received a disbursement of $50,000; she testified that she gave the entire $50,000 to her parents because they had paid the college expenses of her children. The final distribution to the wife occurred in January 2008; the wife testified that she used the entire $85,000 disbursed to her at that time to pay state and federal income taxes.
The parties both employed experts to determine the value of SPS and its stock. Their valuations differed significantly. Both experts testified at trial.
The husband’s expert, Mark Pawlowski, is a certified public accountant (“CPA”) specializing in business valuation. He has two certifications relating to business valuation: a CVA, or certification as a valuation analyst, and a ABV, or an accreditation in business valuation. Pawlowski testified that there are three approaches to valuing a business: the asset approach, the market approach, and the income approach. He explained that he had chosen, in December 2007, to utilize the in *126 come approach when valuing SPS. That approach, he explained, used a capitalization-of-earnings method that required the projection of future earnings. According to Pawlowski, based on the income approach, SPS was worth $6.4 million as of December 2007.
However, Pawlowski explained that SPS’s sales had been decreasing since 2004 and that SPS’s profits had also been deteriorating. Pawlowski questioned how SPS could have made such significant disbursements to its three shareholders in 2008 when it posted an $800,000 loss. Pawlow-ski noted that SPS had offset its production losses by receiving at least $550,000 per year in “Byrd” money, which refers to a tariff imposed on imported seafood that is collected by the federal government and then distributed to domestic seafood producers. In 2008, however, SPS had received no Byrd money. Because of the significant cash-flow issues created by the loss of the Byrd money and the “near impossible” task of estimating ongoing cash flow, Pawlowski said, he reevaluated SPS using the asset method. The asset method, he said, required him to determine the sum of the value of the assets of SPS and to subtract from that sum its liabilities. As of December 31, 2009, Paw-lowski testified, SPS was worth $2.8 million based on the asset method of valuation. Each share of SPS stock was worth approximately $8,860 based on Pawlow-ski’s December 31, 2009, valuation. Paw-lowski adjusted his valuation as of July 31, 2010, based on updated information; he testified that, as of that date, SPS was worth $3.3 million and that each share of SPS was worth $10,541.
The wife’s expert, Jack D. Carney, is a CPA. He submitted two reports valuing SPS. Carney testified that he had reviewed SPS’s financial statements and tax returns and had interviewed Vest and SPS’s president, Greg Ladnier, who is the wife’s brother and an SPS stockholder. Carney said that he had discussed the shrimp business in general and the business climate in Bayou La Batre, where SPS is located, with Greg Ladnier and Vest, as well as with someone named Mr. Ficarino. Specifically, Carney said that he had discussed the decline in the price of shrimp, the loss of suppliers and shrimp boats, the increase in the cost of diesel fuel, the loss of investors for rebuilding due to hurricanes, the decline in the economy, and the assets of the company. Based on the information he gathered, Carney testified, he concluded that SPS was worth $1,719,000 as of December 31, 2007. He explained that he based his conclusion on the fact that he did not think anyone would want to buy the company. He updated his valuation as of July 31, 2010, and determined that SPS was worth $1,206,400 as of that date, in part because of the negative effects of a large oil spill in the Gulf of Mexico on the shrimp industry.
At trial, Carney testified that his opinion of SPS’s worth had been affected by the testimony he had heard. He explained that, based on testimony at trial, he did not believe that the buildings and equipment of the company could be sold for their value because of the lack of the market for those items, that the possibility that SPS would no longer be a “going concern” troubled him, and that the significant losses the company had suffered were problematic.[1] Thus, at trial, Carney lowered his valuation of SPS a final time to $1 million.
*127 Carney’s valuation reports indicate that he applied a “fast sale discount” to SPS’s assets. His estimate of SPS’s value as of July 31, 2010, indicated that it was a liquidated value. Pawlowski testified that Carney was also using an asset approach to valuing SPS; however, he explained that Carney was basing SPS’s value on “liquidation value,” which, Pawlowski explained, resulted in Carney’s “significantly reducing the fair market value of the assets.” Pawlowski testified that there existed no reason to reduce the value of, for example, the inventory on hand by 50%, which Carney had done to arrive at its “liquidated value.” Because there were no indications that SPS was on the verge of liquidation, Pawlowski said, SPS should be treated as he had treated it — as a going concern. In fact, at trial, Greg Ladnier testified that no plans to close or to liquidate SPS existed.
As noted above, the trial court awarded the wife all 158 shares of SPS stock and awarded the husband $120,000 in alimony in gross, representing his share of the parties’ marital assets. The parties had divided all personal property and had sold the marital residence and divided its remaining equity, which had totaled approximately $120,000, before the trial. The trial court was presented with the issues whether the stock had been purchased with marital funds or had been a gift to the wife alone and, if the stock was gift property, whether it had been used for the common benefit of the parties such that it could be considered by the trial court under Ala.Code 1975, § 30-2-51(a). In addition, the trial court was assigned the task of valuing the stock.
In reviewing any division of property, we must be mindful that the trial court has wide discretion over the division of property and that it may use whatever means are reasonable and necessary to equitably divide the parties’ property. Grimsley v. Grimsley, 545 So.2d 75, 77 (Ala.Civ.App.1989). The trial court’s judgment is presumed to be correct and will not be reversed unless it is so unsupported by the evidence as to be unjust and palpably wrong. Grimsley, 545 So.2d at 76. In making a property division, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their ages and health, their conduct, the duration of the marriage, and the value and type of marital property. Lutz v. Lutz, 485 So.2d 1174, 1176 (Ala.Civ.App.1986). Because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed. Murphy v. Murphy, 624 So .2d 620, 623 (Ala.Civ.App.1993).
On appeal, the husband first argues that the trial court erred by admitting and by considering Carney’s testimony regarding the valuation of SPS. He argues that Carney’s testimony should not have been admitted because it was based, in part, on hearsay. The husband further argues that Carney used an inappropriate methodology to value the company and, thus, that the trial court was precluded from relying on Carney’s opinion.
This court has explained that a trial court valuing a closely held business in the context of a divorce is not to determine the “fair market value” of the entity but, instead, is to determine the “fair value” of the entity. Grelier v. Grelier, 44 So.3d 1092, 1097 (Ala.Civ.App.2009). We have determined that a trial court valuing a business for divorce purposes cannot use discounts that artificially deflate the value of the company because such an approach is inequitable. Grelier, 44 So.3d at 1097. As we explained:
“Alabama law has not adopted a ‘fair market value’ standard for assessing *128 marital property. Rather, under Alabama law, a trial court must determine the value of property with the only limitation being that the value must be equitable under the circumstances of the particular case. See generally Yohey v. Yohey, 890 So.2d 160 (Ala.Civ.App.2004). That standard implies that the valuation must be fair to all parties concerned. See generally Black’s Law Dictionary 578 (8th ed.2004) (defining ‘equitable distribution’ as the ‘fair ... allocation’ of marital property). In cases in which a divorce court does not contemplate the sale of a business in which one of the spouses holds a minority interest but, instead, intends that the business shall remain a going concern, it makes little sense to determine fair value by the measuring stick of a hypothetical sales price. That methodology would artificially reduce the value of the marital asset in almost every case, which would be unfair, i.e., inequitable, to the party receiving only a portion of the reduced value or the property equivalent to that reduced value but would be advantageous to the party retaining the business interest, including its actual value to him or her as the holder.”
Id. (emphasis added).
The husband is correct that Carney’s valuation is based entirely on a liquidation approach. Carney said that he reduced his valuation after hearing testimony at trial indicating that the buildings and equipment lacked a market, and he stated in his testimony regarding his earlier valuations that he did not think anyone would want to buy the company. However, SPS was not for sale and was not being liquidated at the time of trial. Using the liquidation approach and applying the “fast sale discounts” resulted in a lower valuation than would otherwise obtain. If the trial court did apply the figures used by Carney, that error obviously would require reversal of the judgment, but if the trial court did not, the error in admitting those figures into evidence would merely be harmless and would not require reversal of the judgment. See Rule 45, Ala. R.App. P. (“No judgment may be reversed or set aside ... on the ground of ... the improper admission ... of evidence, ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”). Consequently, because we are unable to determine whether the trial court relied on Carney’s figures in valuing the shares, we are remanding the cause to the trial court for it to explain how it valued the shares.
The husband further argues that the trial court erred to the extent it failed to include all 158 shares of SPS stock in the marital estate. However, we cannot address the merits of that contention without some indication from the trial court as to the number of shares it considered to be marital property subject to division and its reason for excluding any shares, if in fact it did, when determining the amount of the alimony-in-gross award.
The husband additionally contends that the amount of alimony in gross awarded to him is not fair and equitable. This court cannot give that issue any serious review without knowing the factual determinations made by the trial court as set out above and without also knowing whether the trial court discounted the award for equitable reasons.
Generally, in the absence of specific findings of fact, this court will assume that the trial court made those findings necessary to support its judgment. See Ex parte Fann, 810 So.2d 631, 636 (Ala. *129 2001). However, when, after reviewing the record and the language of the judgment, this court is unable to determine the precise nature of the factual findings of the trial court as to the classification and value of marital property, thereby inhibiting this court’s ability to determine whether a property division is equitable, this court should remand the cause for further clarification from the trial court. See Wilhoite v. Wilhoite, 897 So.2d 303, 308-09 (Ala.Civ.App.2004); and Giardina v. Giardina, 987 So.2d 606, 622-23 (Ala.Civ.App.2008). Accordingly, we remand the cause and instruct the trial court to specify its findings as to (1) the fair value of the 158 shares of SPS stock; (2) the number of shares it determined to be divisible as marital property; (3) the reasons for excluding any shares from its property division, if it did; (4) the factors it considered in dividing the shares; and (5) the calculations it used in reaching its award of $120,000 in alimony in gross to the husband. The trial court shall make a return to this court containing the above-mentioned findings within 42 days.
Because we are remanding the cause as outlined above, we need not address the husband’s other issues at this juncture. If, after clarification of the judgment, the husband still maintains that the trial court erred in limiting his cross-examination of Bruce Vest and in admitting evidence relating to the prior termination of his employment at SPS, this court may address those issues at that time.
The wife’s motion to strike the husband’s brief is denied.
REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

On Return to Remand

PER CURIAM.
The trial court has entered an order as required by our instructions in our opinion on original submission. See Wilson v. Wilson, 93 So.3d 122 (Ala.Civ.App.2011). The trial court’s order on remand reads, in its entirety, as follows:
“In compliance with [the appellate court’s] order of November 18, 2011, with instructions to this Court, the following is submitted:
“In reaching the award set out in the Judgment of Divorce rendered herein, this Court considered the following evidence: testimony of all the witnesses as presented in open Court, the exhibits that were admitted into evidence, the demeanor of the witnesses, length of the marriage of the parties, the relative fault of the parties resulting in the divorce, the age, education, work experience, and health of the parties, the earning potential of the parties, the totality of the marital estate, to include the source and use of marital property.
“After considering the above, the Court determined a fair value of the marital estate and awarded an equitable, not necessarily equal, but equitable property award.
“In making the property award set forth in the Judgment of Divorce, the Court did not apply any specific figures as presented by the witnesses as the basis for its award nor make any mathematical calculations to determine what property would be awarded to the parties. Rather, the court considered the totality of the evidence as presented and arrived at an equitable property awarded [sic].”
The trial court’s order fails to comply with our instructions that it “specify its findings *130 as to (1) the fair value of the 158 shares of [Sea Pearl Seafood Company, Inc.,] stock; (2) the number of shares it determined to be divisible as marital property; (3) the reasons for excluding any shares from its property division, if it did; ... and (5) the calculations it used in reaching its award of $120,000 in alimony in gross to [Eddie W. Wilson].” 93 So.3d at 129.
As explained in our opinion on original submission, the value of the Sea Pearl Seafood Company, Inc. (“SPS”), stock was contested by the parties. In addition, the parties disagreed over whether all 158 shares of SPS stock were marital property. The trial court was required to determine whether all 158 or only 21 shares of the SPS stock were marital property and then to determine the value of the SPS stock in order to effect an equitable property division. The trial court has tacitly admitted that it did neither. Its failure to make the necessary conclusions or perform the necessary calculations required to determine the contents of and the value of the marital estate is not insulated by the ore tenus presumption. Neither this court nor the trial court could possibly determine that the award of $120,000 in alimony in gross to Eddie W. Wilson (“the husband”) is equitable without knowing how many shares of SPS stock were part of the marital estate and without knowing the value of that stock. Accordingly, because the trial court did not determine whether all or part of the SPS stock was included in the marital estate and because the trial court failed to determine the value of the stock, we have no recourse but to reverse the judgment of the trial court and to remand the cause for the trial court to make the necessary determinations and perform the necessary calculations to arrive at an equitable pi’operty division.
Because a decision on the issues raised by the husband on appeal but pretermitted by this court in our opinion on original submission could impact the trial court’s review of the record evidence, we will address the husband’s arguments that the trial court erred in (1) limiting his cross-examination of Suzanne L. Wilson (“the ■wife”) and (2) in admitting testimony regarding the prior termination of the husband’s employment with SPS.
The husband complains on appeal that the trial court erred in limiting his cross-examination of the wife regarding her friendship with Bruce Vest, SPS’s accountant, with which the husband intended to prove bias on the part of Vest. The husband relies on the general principle that “a party is entitled to a thorough and sifting cross-examination of the witnesses against him.” Perry v. Brakefield, 534 So.2d 602, 607 (Ala.1988). He also points out that “ ‘[i]t is always competent on cross-examination to make such interrogation of a witness as would tend to test his interest, bias or prejudice or to illustrate or impeach the accuracy of his testimony.’ ” Ex parte Brooks, 393 So.2d 486, 487 (Ala.1980) (quoting Green v. State, 258 Ala. 471, 474, 64 So.2d 84, 87 (1953)). Of course, a trial court may limit cross-examination “that is repetitious, irrelevant, harassing, annoying, or humiliating, or concerns wholly collateral matters.” Riley v. City of Huntsville, 379 So.2d 557, 560 (Ala.1980). We note that “[t]he usual discretion vested in the trial court to control the extent of cross-examination is narrowed in proportion to the extent of the adverseness of the testimony of the witness and the value to the defendant of a disaccreditation of the witness.” Hendrick v. State, 368 So.2d 576, 578 (Ala.Crim.App.1979).
Certainly, the husband had a general right to attempt to establish bias on the part of Vest through cross-examination. However, Vest’s testimony was confined to basic financial information regard *131 ing SPS based on documents in evidence and to the issue whether the wife had paid for the stock she had acquired in SPS. The fact that Vest’s testimony regarding the wife’s failure to pay for the stock was identical to testimony from the wife and her father, Joseph Ladnier, on that subject renders Vest’s testimony merely cumulative. Pipeline Technic, L.L.C. v. Mason, 6 So.3d 1176, 1181 (Ala.Civ.App.2008); Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993) (“Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.”). “ ‘The exclusion of admissible evidence does not constitute reversible error where the evidence “would have been merely cumulative of other evidence of the same nature, which was admitted.” ’ ” Jordan v. Calloway, 7 So.3d 310, 315 (Ala.2008) (quoting Houston v. State, 565 So.2d 277, 281 (Ala.Crim.App.1990), quoting in turn Ex parte Lawson, 476 So.2d 122, 122 (Ala.1985)). Thus, any error on the part of the trial court in limiting the husband’s ability to prove that Vest was biased in favor of the wife was harmless error not affecting the husband’s substantial rights. See Rule 45, Ala. R.App. P.; see also Hendrick, 368 So.2d at 578 (reversing because the trial court failed to allow a thorough cross-examination but noting specifically that “[s]uch testimony would not have been cumulative”).
The husband further argues that the trial court erred in admitting testimony regarding his being terminated from his employment with SPS in 1976, when he was approximately 18 years old, after being accused of stealing money and shrimp from SPS. The husband objected at trial to the relevancy of the testimony. On appeal, however, he argues that the testimony should have been excluded because it involved a matter that was remote and because it constituted improper impeachment evidence on a collateral matter. We cannot consider the husband’s arguments regarding any error in the admission of this testimony on appeal.
“ ‘The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.’ Ex parte Frith, 526 So.2d 880, 882 (Ala.1987); see also State v. Holloway, 293 Ala. 543, 307 So.2d 13 (1975); Scarbrough v. State, 528 So.2d 890 (Ala.Crim.App.1988). In other words, ‘if only a specific objection is made and overruled, the appellate court will not consider any other grounds of objection.’ C. Gamble, McElroy’s Alabama Evidence, § 426.01(11) (3d ed.1977).”
B.A.S.S. Coal, Inc. v. Black Warrior Minerals, Inc., 579 So.2d 1325, 1327 (Ala.1991). The husband’s relevancy objection waived any other ground for objection, and the husband’s failure to argue the relevancy of the challenged testimony on appeal prevents us from considering whether the trial court erred in admitting it.
In our opinion on original submission, we concluded that the trial court was precluded from relying on the stock-valuation testimony provided by Jack D. Carney. We have further concluded that we cannot consider the husband’s argument relating to the testimony regarding the termination of his 1976 employment with SPS and that any error committed by the trial court in limiting the husband’s cross-examination of the wife was harmless error. However, the trial court’s admitted failure to determine whether all or part of the SPS stock was part of the marital estate and its failure to determine the value of that stock makes it impossible for this court to determine whether the trial court’s $120,000 award of alimony in gross *132 to the husband was equitable. Therefore, we reverse the trial court’s judgment awarding the husband $120,000 in alimony in gross, and we remand the cause to the trial court for it to reconsider its property division based on the evidence of record and to enter a new judgment containing a property division consistent with this opinion and our opinion on original submission.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.
BRYAN, J., recuses himself.

. Interestingly, we note that Carney should have been well aware of the losses suffered by SPS after reviewing the company’s financial statements and tax returns, as he testified he had done.